IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Marian E. Mitchell-Henderson,       :
                    Plaintiff       :       Civil Action 2:08-cv-167

        v.                          :       Judge Holschuh

Michael J. Astrue,                  :       Magistrate Judge Abel
Commissioner of Social Security,
                    Defendant       :


**REPORT AND RECOMMENDATION**

Plaintiff Marian E. Mitchell-Henderson brings this action under 42 U.S.C.

§§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security denying her applications for social security disability and supplemental

security income benefits.  This matter is before the Magistrate Judge for a report and

recommendation on the administrative record and the parties' merits briefs.

**Summary of Issues.** Plaintiff Marian E. Mitchell-Henderson  maintains that at

age 31 she became disabled due to back and knee pain. (R. 129.) She was 36 years old

the time of the administrative hearing. The administrative law judge found the plaintiff

retained the ability to perform a substantial number of jobs having sedentary to light

exertional demands.

Plaintiff argues that the decision of the Commissioner denying benefits should be

reversed because:

- The administrative law judge failed to give the proper weight to treating and
  consulting sources who supported a finding of disability.

- The administrative law judge failed to have a medical expert present at the hearing.

**Procedural History.** Plaintiff filed her applications for disability insurance benefits and social security supplemental income on September 17, 2001, alleging that she became disabled on August 31, 2001, at age 31. (R. 93-95, 321-23.) The applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. On May 8, 2003, Administrative Law Judge Thomas P. Piliero held an initial hearing at which plaintiff, represented by counsel, appeared and testified. (R. 337-88.) On September 4, 2003, the administrative law judge issued a decision finding that Mitchell-Henderson was not disabled within the meaning of the Act. (R. 61-67.) The Appeals Council remanded plaintiff's case back to the administrative law judge. (R. 74-75.) On August 4, 2005, the administrative law judge issued a new decision, he concluded that a new hearing was not warranted. (R. 40-45.) The Appeals Council again remanded plaintiff's case, this time to a new administrative law judge. (R. 80-83.) On June 20, 2006, Administrative Law Judge Rita Eppler, held an hearing at which plaintiff, represented by counsel, appeared and testified. (R. 389-432.) A vocational expert also testified. On July 26, 2006, the administrative law judge issued a decision finding that Mitchell-Henderson was not disabled within the meaning of the Act. (R. 16-24.) On January 18, 2008, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security. (R. 4-7.)

2

**Age, Education, and Work Experience.**     Plaintiff Marian E. Mitchell-Henderson was born January 21, 1970. (R. 165.)  She was 36 years old at the time the administrative law judge issued her decision.  Mitchell-Henderson has an 11th grade education. (R. 156.)  She has had past work experience as a telemarketer, security guard, cleaner, cashier and blood donor unit assistant. (R. 120-127.)

**Plaintiff's Testimony.**  At the June 20, 2006 hearing, plaintiff Mitchell-Henderson testified that she weighed 218 pounds and her normal weight is between 135 to 165, even though the last time she was at that weight was between 1996 and 1997.  (R. 399.)  She stated she had constant back pain that radiated up her spine.  (R. 407-08.) She reported numbness and pain in her right arm and fingers.  She has difficulty wearing shoes because her arches are deteriorating.  (R. 413.)  Plaintiff drove 2-3 times per week and drove to her hearing. (R. 400.)

Plaintiff further testified that she drank three to four 40 ounce beers per day for 10-15 years, and she smoked crack every day.  She stopped when she began attending church at the very end of 2004.  (R. 401-03 and 406.)  When Mitchell-Henderson takes her pain medication, she becomes drowsy and high.  (R. 407.)  Plaintiff testified she did not take her medication before she drove.  (R. 409-10.)  She was pain-free with Vicodin, but she could not work because she was "high" when she took it.  (R. 417.)

Plaintiff also testified that Dr. Hoy put her on bed rest.  (R. 414.)  She elevated her feet when they swelled.  (R. 415.)  Mitchell-Henderson testified she could sit for one hour, and stand for 25-30 minutes. (R. 415.)

Plaintiff denied any mental health treatment. (R. 405.) She claimed to be depressed because she was unable to do anything and frequently cries. (R. 407, 409.)

**Vocational Expert's Testimony.** The vocational expert present at the hearing was asked to assume an individual with plaintiff's age, education and work experience with the limitations of lifting 10 pounds; stand and walk for two hours; sit for six hours; push and pull 20 pounds; never climb, balance, kneel, crouch, crawl, or stoop; no work in temperature extremes, near humidity, around vibration, or with hazards. The vocational expert testified that this person could perform her past work as a telemarketer. With further hypotheticals involving the limitations suggested by Drs. Rutherford, Schlonsky, Hammerly and Yee, plaintiff could still perform her telemarketer job. The limitations due to alcohol abuse would not be consistent with Mitchell-Henderson performing any of her past work. Upon questioning by plaintiff's attorney, the vocational expert testified that if a person had a marked limitation in interacting with others in stressful situations then she would not be able to perform the telemarketer job. (R. 419-31.)

**Medical Evidence of Record.** The relevant medical evidence of record is summarized as follows:

**Physical Impairments:**

Emmart D. Hoy, D.O. Plaintiff Mitchell-Henderson initially saw Dr. Hoy in February 2001. She indicated on a questionnaire that her symptoms were muscular back and joint pain. Plaintiff denied any current or past treatment by a psychiatrist.

Plaintiff weighed 215 pounds. Plaintiff claimed she had back and knee arthritis, along with a variety of other problems including nausea, headaches, nose bleeds, ear pain, and vaginal discharge. (R. 188-95.) Plaintiff saw Dr. Hoy from February 2001 through September 2001 for medication refills and for other complaints. (R. 163-87 and 307-17.) Dr. Hoy diagnosed osteoarthritis and degenerative joint disease in plaintiffs knees, thoracic scoliosis, peripheral edema, ganglion right wrist, and morbid obesity. *Id.*

On August 22, 2001, left knee and spinal x-rays suggested scoliosis of the thoracic spine, but normal lumbar spine and normal knees. (R. 163-66, 176, 241.) An X-ray of plaintiff's thoracic spine performed on October 2, 2001, revealed scoliosis of the mid- and upper thoracic spine. (R. 164.) X-rays of lumbar spine and left knee were normal. *Id.*

Dr. Hoy treated Mitchell-Henderson from December 2002 through April 2003, primarily for medication refills. (R. 210-13.) Examinations revealed no edema, although there was pain on range of motion and an antalgic gait. *Id.* In March 2003, Mitchell-Henderson weighed 223 pounds. (R. 210.)

A January 2002 left knee x-ray revealed a normal left knee. (R. 244.) On July 5, 2002, a left knee MRI suggested chondromalacia patella, small posterolateral synovial or ganglion cyst, and small joint effusion. (R. 174, 243.) A December 2002 MRI of the right knee showed no evidence of meniscal or ligamentous tear, small joint effusion with popliteal cyst and chondromalacia patella. (R. 235.)

On May 19, 2003, Dr. Hoy completed a basic medical form for the Ohio Depar-

tment of Job and Family Services. He indicated that Mitchell-Henderson could lift 20 pounds occasionally and 10 pounds frequently. She could sit, and stand a walk for one hour at a time each, and for a total of only 2 hours each in an eight-hour day. He based these limitations on physical exam and x-rays. He noted Mitchell-Henderson had "no mental impairment. (R. 229-30.)

A January 2004, right knee x-ray showed probable small suprapatellar, joint effusion and mild early degenerative changes. (R. 226.) A lumbar spine x-ray taken that same day was normal. (R. 227.) An April 2006 lumbar spine x-ray was unremarkable. (R. 305.)

Mark Triffon, M.D. On August 27, 2002, Dr. Triffon evaluated Mitchell-Henderson's knee pain at the request of Dr. Hoy. Plaintiff complained of a long history of bilateral knee pain, stating her knees had hurt every day for the last five years. Her knees swelled up. She also said she had recently gained 55 pounds.

On physical examination, Mitchell-Henderson was tender to touch of her skin at the knees. She had a slow but full range of knee motion. There was no evidence of instability, and x-rays were negative. Dr. Triffon noted that, while it was possible Mitchell-Henderson had some chondromalacia patella symptoms. She appeared to be in discomfort out of proportion to her examination. (R. 219.)

Henry D. Rocco, M.D. In January 2003, Dr. Rocco, a specialist in orthopedics, saw Mitchell-Henderson for low back and knee pain. Plaintiff weighed 230 pounds. Upon examination, her heel toe gait was normal. She had difficulty with balance, but

there was normal manual muscle testing, sensation, and reflexes, and negative straight leg raising. Plaintiff had full range of motion of her knees with no effusion, redness, or increased skin temperature. The diagnoses were (1) patellofemeral syndrome, chondromalacia and (2) low back pain syndrome. Dr. Rocco indicated that Mitchell-Henderson should enhance her fitness level to lose weight. He recommended activity and a water aerobics program; and he "encouraged her not to be at bed rest, but to be active." Dr. Rocco noted that Mitchell-Henderson "certainly is not a candidate for surgical intervention of her knees nor her lumbar spine." (R. 218.)

James H. Rutherford, M.D., F.A.A.O.S. On February 11, 2003, Dr. Rutherford performed a disability examination of Mitchell-Henderson for the Commissioner. (R. 197-207.) Plaintiff complained that three years earlier her knees swelled so much that she was unable to stand. She had been in therapy and on bed rest to reduce swelling. At that time Mitchell-Henderson's weight was 228 pounds. (R. 198.)

On examination, she had difficulty with knee bends, and mid thoracic spine tenderness, but she had no muscle spasm or atrophy, and motor function in her legs was intact; as were sensation and reflexes. She had crepitus in both knees and reduced flexion in her knee; she also had reduced dorso lumbar range of motion but otherwise normal spinal ranges of motion. (R. 198.) She used a cane because of pain in her knees with weight bearing. (R. 197.)

Dr. Rutherford concluded that Mitchell-Henderson was limited to sedentary work. She could sit for one hour at a time, for a total of six hours during an eight hour

work day.  (R. 198-99.)  She could stand and walk for 15 minutes at a time, for a total of

two hours a work day.  She could lift up to 10 pounds occasionally.  It was appropriate

for her to use a cane while walking.  She could not stoop or bend below knee level; and

she could do no climbing, crawling, kneeling or balancing.  She could drive her own

car, but not drive heavy equipment, work at unprotected heigh, or need hazardous

machinery or on wet surfaces, or with vibrating equipment.  (R. 199.)  Dr. Rutherford

noted, "The etiology of the pain, swelling and limitation of motion of Ms. Mitchell's

knees is uncertain at this time, though she does apparently have some patellar femoral

crepitus." *Id.*

    <u>Dr. McCloud, and Dr. Hinzman</u>  In June and August 2004, Dr. McCloud, and Dr.

Hinzman reviewed the medical evidence of record for the Commissioner and

concluded Mitchell-Henderson could lift 10 pounds, stand and walk for two hours, and

six for six hours, had limited use of her arms, could occasionally climb, but should

never balance, stoop, kneel, crouch, or crawl.  (R. 267-68.)

    <u>Joseph Schlonsky, M.D.</u>  In March 2006, Dr. Schlonsky, M.D. performed a con-

sultative examination.   Dr. Schlonsky stated that despite multiple complaints, he found

no clinical evidence of nerve root compression in the her cervical, lumbar, or dorsal

spine.  Dr. Schlonsky said that Mitchell-Henderson's complaints seemed to be out of

proportion to the objective findings; and she did not need knee surgery.  (R. 295-96.)

    Dr. Schlonsky stated the opinion that Mitchell-Henderson could perform light

work.  He said that she could lift up to 50 pounds occasionally and 25 pounds frequent-

ly.  She could sit without limitation; and she could stand/walk for 4 hours.  Plaintiff

should never kneel, crouch, or crawl, but could occasionally climb, balance, and stoop.

(R. 301.)

**Mental Impairments:**

Netcare.  On November 19,2002, Mitchell-Henderson referred herself to

NetCare claiming she "needed to talk to someone" due to multiple stressors including

past sexual abuse, chronic pain, financial and marital problems.  Plaintiff claimed she

had gained 50 pounds that year and was upset about it.  She also reported drinking two

40-ounce beers every day for the past month.  Mitchell-Henderson's posture was

natural and her body movements were comfortable.  The counselor said plaintiff was

experiencing a mental health crisis.  She was referred to assessment services.  Mitchell-

Henderson expressed interest in counseling, but there are no further records from

Netcare.  (R. 214 - 216.)

Louis B. Hoyer, Ph.D.  On April 18, 2003, Dr. Hoyer performed a disability

examination of Mitchell-Henderson.  Based on his examination, Dr. Hoyer said that

Mitchell-Henderson had mental anguish due to pain in her knees and "anxiety of

enormous proportions over the inability of physicians to find the cause of her pain."  He

concluded that Mitchell-Henderson is both physically limited and psychologically

distressed to a point of being restricted in her work possibilities.  Frequent and severe

pain, predominantly in Mitchell-Hendersons knees, had resulted in anxiety, depression,

and an inability to interact socially due to an overall inability to cope with her

impairments.  (R. 208-09.)

Keli A. Yee, Psy. D. On April 4, 2004, Dr. Keli Yee performed a disability exam-ination of Mitchell-Henderson for the Commissioner.  (R. 245-49.)  Plaintiff drove her-self to the evaluation.  She reported that she is disabled due to back and knee problems. She has never been prescribed medication for her emotional problems.  (R. 245.) She denied having problems with alcohol and drugs.  She reported having "been fired from a past job for attendance." (R. 246.)  Dr. Yee concluded that Mitchell-Henderson's ability to relate to others was mildly to moderately impaired.  Her ability to understand, remember, and follow instructions was mildly impaired.  (R. 248.)  Plaintiff's ability to maintain concentration, persistence, and pace was not impaired.  Her ability to with-stand stress and pressure associated with day-to-day work activity was moderately impaired.  (R. 249.)

Dr. Waddell, and Dr. Coyle   In June 2004, Doctors Waddell and Coyle, psycholo-gists, reviewed the medical evidence of record for the Commissioner.  (R. 250-65.)  They concluded Mitchell-Henderson had a moderate restriction with daily activi-ties and social functioning, but mild difficulty with concentration, persistence, or pace. (R. 260.) Plaintiff had a few moderate restrictions in mental functioning but generally was not significantly limited in 14 of 20 areas assessed.  (R. 263-64.)  They concluded that Mitchell-Henderson's allegations were not fully credible, and that she retained the mental residual functional capacity to perform 2-3 step tasks of a routine nature.  (R. 265.)

_Mark Hammerly, Ph.D._  In March 2006, Dr. Hammerly conducted a psychologic-al evaluation for the Commissioner.  (R. 278-93.)  Dr. Hammerly noted the Mitchell-Henderson was clean and casually dressed.  She was generally cooperative and friend-ly.  (R. 280-81.)  Her speech was understandable, logical, coherent, goal directed, alert, and oriented.  She exhibited sufficient information, judgment, and common sense reasoning ability to live independently and to make important decisions concerning her future.  Her mood was "down" and her affect was constricted and sometimes tearful, but there was no evidence of suicidal ideation, grandiosity, expansiveness, elevated mood, irritability, manic traits, more than mild psychomotor retardation, panic attacks, agoraphobia, hallucinations, delusions, paranoia, obsessive-compulsive behavior, or recurrent or intrusive recollections of a traumatic event.  (R. 281.)  She tries to help with household duties, including dishwashing, laundry cleaning, cooking, housecleaning, and grocery shopping.  (R. 283.)  Plaintiff said she drank three 40-ounce bottles of malt liquor the night before.  She drank nearly every day, but tried not to on Sunday is she should decide to go to church.  (R. 280.)

 After evaluating Mitchell-Henderson, Dr. Hammerly diagnosed posttraumatic stress disorder, adjustment disorder with depressed mood, alcohol abuse, and pain disorder and assigned Mitchell-Henderson a Global Assessment of Functioning (GAF) score of 50.  (R. 286-86.)  Dr. Hammerly concluded that Mitchell-Henderson had mod-erate impairment relating to others, but could relate superficially to co-workers and supervisors for simple repetitive tasks; no limitation in her ability to understand,

remember, and follow instructions; no impairment with maintaining attention, concentration, and persistence and pace for simple repetitive tasks; and severely impaired ability to withstand stress and pressure.  Although Dr. Hammerly concluded that Mitchell-Henderson would have marked limitation responding to supervision, co-workers, and pressures at work, he noted that alcohol abuse exacerbated Mitchell-Henderson's mental illness and worsened the outcome of any rehabilitation attempt.  Without alcohol abuse and with better treatment, Mitchell-Henderson would have moderate limitation in the above areas.  (R. 285-86.)  However, he felt abstinence was not likely.  (R. 292.)

**Administrative Law Judge's Findings.**  The administrative law judge found that:

1. The claimant met the disability insured-status requirements of the Act on August 31, 2001, her alleged disability onset date, and continued to meet them through December 2004.

2. The claimant has not been engaged in substantial gainful activity since her alleged disability onset date.

3. The claimant has the following impairments that reduce her ability to perform basic work-related functions: degenerative joint disease of her knees, scoliosis of her thoracic spine, posttraumatic stress disorder, adjustment disorder with depressed mood, and a history of polysubstance abuse (alcohol and crack cocaine).

4. The claimant's alcohol and drug disorder meets the requirements of Listing 12.09 in, 20 CFR Part 404, Subpart P, Appendix 1. In the absence of alcohol and drug abuse, she does not have an impairment that meets or equals the requirement of any impairment listed in Appendix 1.

5. The claimant's subjective complaints are disproportionate with and not sup-

ported by the objective and substantial evidence in the record to the extent they suggest that she is disabled.

6. The claimant has the residual functional capacity ("RFC") to perform "sedentary" to "light" exertional work, subject to the following: (1) no lifting and/or carrying of greater than 25 pounds occasionally or 20 pounds frequently; (2) no standing and/or walking for greater than four hours in a workday; (3) no kneeling, crouching, or crawling; and (4) no more than occasional climbing, balancing, or stooping. From a mental standpoint, assuming the absence of alcohol and/or drug abuse, she is able to perform simple, repetitive tasks, consistent with moderately limited abilities to relate to others, respond appropriately to changes in a routine work setting, and respond appropriately to work pressures in a usual work setting.

7. The claimant retains the residual functional capacity to perform her past relevant work as a telemarketer ("sedentary" exertion, "semiskilled").

8. The claimant's alcohol and drug abuse has been a "material" factor to her disability.

9. The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of this decision, assuming the absence of alcohol and drug abuse.

(R. 23-24.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366

(6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining

whether the Commissioner's decision is supported by substantial evidence, the Court

must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers*

*v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and*

*Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.** Plaintiff argues that the decision of the Commissioner

denying benefits should be reversed because the administrative law judge failed to

properly weigh the treating and consulting sources that would support a finding of

disability. Plaintiff also contends that the administrative law judge should have secured

the assistance of a medical expert for the hearing.

Medical Source Opinions: Legal Standard. A treating doctor's opinion on the

issue of disability is entitled to greater weight than that of a physician who has examin-

ed plaintiff on only one occasion or who has merely conducted a paper review of the

medical evidence of record. *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v.*

*Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983). The treating

doctor has had the opportunity to observe his patient's impairments over the course of

time.

Even though a claimant's treating physician may be expected to have a greater

insight into his patient's condition than a one-time examining physician or a medical

adviser, Congress specifically amended the Social Security Act in 1967 to provide that

to be disabling an impairment must be "medically determinable." 42 U.S.C. § 423 (d) (1) (A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975), 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527.

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory find-ings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidenti-ary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. §

404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify." *Id.* When the treating source's opinion "is well supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ." The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion. When the doctor has treated the claimant long enough "to have obtained a longitudinal picture of your impairment, we will give the source's [opinion] more weight than we would give it if it were from a non-treating source." 20 C.F.R. §404.1527(d)(2)(i).

The Commissioner has issued a policy statement about how to assess treating sources' medical opinions. Social Security Ruling 96-2p. It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

The case law is consistent with the principals set out in Social Security Ruling 96-2p. A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). The Commissioner must make the final decision on the ultimate issue of disability. *Duncan v. Secretary of Health and Human Services*, 801 F.2d

847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Medical Source Opinions: Discussion. Plaintiff asserts that the administrative law judge based Mitchell-Henderson's residual functional capacity primarily on the opinion of Dr. Schlonsky. (R. 19, 21.) Plaintiff argues the administrative law judge "casually mentions" Dr. Rutherford's report, which supports a finding of disability, and dismisses his opinion in favor of Dr. Schlonsky's more recent examination. *See,* Doc 11 at 5.

The appeals counsel remanded the September 4, 2003 decision of the previous administrative law judge, to consider Dr. Rutherford's opinion that Mitchell-Henderson's use of a cane for walking was justified, his limiting her to walking for 15 minutes at a time and sitting for an hour at a time, and her inability to use heavy vibrating equipment. (R. 74.) The Appeals Council ordered the administrative law judge to reassess Mitchell-Henderson's residual functional capacity and to secure the testimony of a vocational expert.

In her July 26, 2006 decision, the administrative followed the instructions of the Appeals Council. The administrative law judge evaluated Dr. Rutherford's opinion consistent with the statute and regulations and reasonably declined to give it control-ling weight. Both Dr. Rutherford and Dr. Schlonsky were one-time consultative physicians. One opinion was not entitled to any greater weight than that of any another one-time consultative physician. The administrative law judge weighed both opinions

18

and found that Dr. Schlonsky's opinion was based on a more recent consultative examination and was consistent with the fairly normal objective findings found throughout the record.

Here Dr. Schlonsky's findings are consistent with the x-rays and MRIs of record . (R. 163-66, 176, 219, 227, 241, 244, 305) and the findings and assessments made by Dr. Triffon (R. 219), Dr. Rocco (R. 218), and Dr. Hoy (R. 229-30). Further, the administrative law judge's residual functional capacity assessment is consistent with Dr. Rutherford's. The administrative law judge carefully considered all of the medical evidence, not just Dr. Schlonsky's report, in making her residual functional capacity assessment. (R. 63-65.)

Plaintiff further argues that the administrative law judge should have given greater weight to Dr. Mark Hammerly's report. Plaintiff asserts that Dr. Hammerly found that Mitchell-Henderson had borderline intellectual functioning. But Dr. Hammerly did not make a diagnosis of borderline intellectual functioning. Plaintiff's WAIS-III scores were within the borderline range of intellectual functioning (R. 289), but Dr. Hammerly said that he was making no diagnosis concerning her performance on the WAIS-III because he believed that "intellectual assessment to be overly low . . . ." (R. 283.) Instead, Dr. Hammerly found that Mitchell-Henderson retained the "ability to understand, remember, and follow instructions . . . ." (R. 287.) She was "capable of comprehending and completing simple, routine ADL tasks both at home and in the community." *Id.*

19

Finally, plaintiff argues that the administrative law judge should have secured the assistance of a medical expert to evaluate and explain the postural limitations documented by Dr. Rutherford.

The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the administrative law judge, a who is not a medical professional, may understand. *See, Richardson v. Perales,* 402 U.S. 389, 408 (1972). The Commissioner's regulations provide that an administrative law judge "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. § 404,1527(f)(2)(iii). The Commissioner's operations manual indicates that it is within the administrative law judge's discretion whether to seek the assistance of a medical expert. HALLEX I-2-5-32 (September 28, 2005). "The primary reason an ALJ may obtain ME opinion is to gain information which will help him or her evaluate the medical evidence in a case, and determine whether the claimant is disabled or blind." *Id.* The operations manual indicates that an administrative law judge "may need to obtain an ME's opinion" in the following circumstances:

- the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s);
- the ALJ is determining the usual dosage and effect of drugs and other forms of therapy;
- the ALJ is assessing a claimant's failure to follow prescribed treatment;
- the ALJ is determining the degree of severity of a claimant's physical or mental impairment;

- the ALJ has reasonable doubt about the adequacy of the medical record in a case, and believes that an ME may be able to suggest additional relevant evidence;
- the medical evidence is conflicting or confusing, and the ALJ believes an ME may be able to clarify and explain the evidence or help resolve a conflict;
- the significance of clinical or laboratory findings in the record is not clear, and the ALJ believes an ME may be able to explain the findings and assist the ALJ in assessing their clinical significance;
- the ALJ is determining the claimant's residual functional capacity, *e.g.*, the ALJ may ask the ME to explain or clarify the claimant's functional limitations and abilities as established by the medical evidence of record;
- the ALJ has a question about the etiology or course of a disease and how it may affect the claimant's ability to engage in work activities at pertinent points in time, *e.g.*, the ALJ may ask the ME to explain the nature of an impairment and identify any medically contraindicated activities; or
- the ALJ desires expert medical opinion regarding the onset of an impairment.

HALLEX I-2-5-34 (September 28, 2005). An administrative law judge's decision whether a medical expert is necessary is inherently discretionary. An administrative law judge abuses her discretion only when the testimony of a medical expert is "required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations. *See* 20 C.F.R. § 416.1444." *Haywood v. Sullivan,* 888 F.2d 1463, 1467-68 (5th Cir. 1989).

Here the administrative law judge did not abuse her discretion. Her decision included a fair recitation of the evidence and included thorough, well-documented findings supporting the conclusion that plaintiff Mitchell-Henderson was not disabled. (R. 16-24.)

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.** It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


   s/Mark R. Abel         
United States Magistrate Judge